RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0090p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

Nos. 12-4004/4051

JAMES C. DIMORA (12-4004) and MICHAEL D. GABOR (12-4051);

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland
No. 1:10-cr-00387—Sara E. Lioi, District Judge.

Argued: March 12, 2014

Decided and Filed: April 30, 2014

Before: MERRITT, SUTTON and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Christian J. Grostic, KUSHNER & HAMED CO., L.P.A., Cleveland, Ohio, for Appellant in 12-4004. David G. Oakley, Cleveland, Ohio, for Appellant in 12-4051. Antoinette T. Bacon, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Christian J. Grostic, KUSHNER & HAMED CO., L.P.A., Cleveland, Ohio, for Appellant in 12-4004. Leif B. Christman, Cleveland, Ohio, for Appellant in 12-4051. Antoinette T. Bacon, Laura McMullen Ford, Ann C. Rowland, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

SUTTON, J., delivered the opinion of the court in which GRIFFIN, J., joined, and MERRITT, J., joined except for Part V-i. MERRITT, J. (pp. 15–17), delivered a separate dissenting opinion as to that part.

1

---

**OPINION**

---

SUTTON, Circuit Judge.   In the aggregate, a jury convicted two Cuyahoga County officials, James Dimora and Michael Gabor, of 39 violations of federal anti-corruption laws stemming from their participation in a slate of bribery and fraud schemes involving various Cleveland-area favor-seekers.  Expensive trips to Las Vegas in exchange for county patronage, thousands of dollars in cash in exchange for government jobs, extensive home improvements to the tune of $30,000 in exchange for public construction contracts—these and other this-for-that arrangements were more than kindly gestures, more than mere "pleases" and "thank yous," among friends.  The jury instead found, after a 37-day trial, that the evidence showed Dimora and Gabor participated in a host of corrupt bargains and arrangements prohibited by federal law. We affirm their convictions and sentences.

I.

From 1998 to 2010, Dimora was one of three elected commissioners for Cuyahoga County.  Three commissioners historically have led the government of the county, though that changed (perhaps due to the charges in this and related cases) when the people of Cuyahoga County voted for a county executive form of government that started in 2011. Gabor occupied a less prominent position in the county's government.  From 2005 to 2010, he worked for the county's weights-and-measures office, which inspects gas pumps, grocery store scanners, truck scales and the like for accuracy.

In 2007, the FBI launched an investigation of public corruption in Cuyahoga County. Through thousands of wiretaps and other means, the investigation revealed that Dimora's tenure as commissioner was rife with *quid pro quo* arrangements between him and individuals seeking favors of one sort or another from the county and other governments.  He handed out public jobs, influenced Cleveland decision-makers and steered public contracts in return for approximately 100 bribes worth more than $250,000.  A few examples illustrate the pattern.  A contractor named Ferris Kleem testified that he funded a trip to Las Vegas for Dimora, covering the costs of

gambling chips, luxury hotel suites and a $2,219 dinner. In exchange, Kleem got "influence at Cuyahoga County and . . . protection for [his] businesses." R. 1014 at 41. "I . . . expected that [Dimora] would do me favors," Kleem testified, "and he always did." *Id.* at 78. Charles Randazzo, a retirement plan salesman, testified that he won Cuyahoga County's business after giving Dimora a $1,079 cashier's check, which Dimora used to buy a tiki hut for his backyard. As Frank Russo, the County Auditor who pleaded guilty to several counts of public corruption covering the same time period, described the relationship, "[Randazzo] did a lot for [Dimora] and [me], and he expect[ed] a lot from us." R. 1039 at 173. The gifts did not stop at Vegas vacations and tiki huts. The government introduced a phone call between Dimora and Rob Rybak, a plumbers' union representative, who said that he would cover the cost of a prostitute for Dimora if the county hired more plumbers. "[W]e'll handle it," Dimora told Rybak, and he did. R. 1020 at 180. And in return for jobs for family and friends, Nicholas Zavarella performed more than $30,000 of home improvement work on Dimora's house free of charge.

While Gabor did not wield Dimora's authority or receive as many meals, gifts, trips and home improvements, he was not afraid to use his influence in similar ways for similar reasons. He started on the wrong foot by buying his job from Russo for $5,000. After that start, Gabor was an auditor in name only. He spent most of his time running errands for Dimora that had nothing to do with the customary requirements of the job. Among other things, he was a go-between in arranging kickback schemes on county projects. And when Gabor learned that the FBI was investigating him, he warned his co-conspirators about the investigation and tried to convince them to lie about what they were up to.

After a 37-day trial recounting these and many other comparable acts and featuring Russo as a lead witness, a jury convicted Dimora and Gabor of various federal crimes, including conspiracy, bribery, fraud and obstruction of justice. The district court sentenced Dimora to 336 months in prison and Gabor to 121 months.

## II.

Gabor and Dimora challenge the jury instructions on several grounds. Gabor first attacks the unanimity instruction on the RICO charge. The statute makes it unlawful to conspire to participate in the affairs of an enterprise through a "pattern of racketeering activity." 18 U.S.C.

§ 1962(c), (d).  The court instructed the jury that to convict Gabor on the charge it "must be unanimous as to which type or types of predicate racketeering activity [he] agreed would be committed."  R. 1044 at 145–46.  Gabor claims the court should have said more, requiring unanimity about which *acts* the conspirators agreed to commit, not which *types* of acts they agreed to commit.  Even if Gabor were entitled to this additional instruction, a point we need not decide, any confusion on this score is of his own making.  The district court offered to give a special verdict form, which would have asked the jurors to indicate which alleged acts contributed to their conspiracy conviction.  Gabor rejected the offer, insisting that the court ask the jury for a general verdict on the RICO charge.  Having invited this general verdict, Gabor cannot complain about the (alleged) lack of detail it now provides.  *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993).

Gabor and Dimora both claim that the court failed to instruct the jury sufficiently on the difference between gifts given in friendship and bribes given in exchange for official acts.  No error occurred.  The jurors heard that "effort[s] to buy favor or generalized goodwill" do not necessarily amount to bribery, that official acts may come in the guise of formal and informal influence, and that gifts exchanged solely to cultivate friendship are not bribes.  R. 1044 at 48–51.  On the other side of the coin, the jurors heard that bribery and kickbacks involve "the intent to . . . exchange . . . money or other thing[s] of value in return for official action."  *Id.* at 49.  These instructions fairly trace the line between permissible gifts and impermissible bribes.  *See United States v. Terry*, 707 F.3d 607, 612–14 (6th Cir. 2013).

The defendants notably do not claim that these instructions misdescribe the line.  They instead argue that the district court should have given additional instructions to clarify the distinction still further.  They asked for an instruction that "[p]ayments for entertainment, lodging, [and] travel . . . are not bribes if the aim of the giver is to cultivate . . . 'friendship' with the public official."  R. 665 at 2.  And they asked for an instruction that "[t]he generalized hope or expectation of ultimate benefit on the part of the giver does not constitute a bribe."  *Id.*  But the jury already knew that property given in friendship and without expectation does not amount to a bribe, and the jury already heard that bribery does not include gifts given in the hope that "at some unknown, unspecified time, [a public official might] act favorably in the giver's interests,"

R. 1044 at 48–49.  Choosing different words to explain the same concept does not amount to an abuse of discretion.  *United States v. Jones*, 647 F.2d 696, 700 (6th Cir. 1981).

III.

The jury convicted Dimora of 32 separate counts of bribery, fraud, obstruction of justice and other crimes.  He challenges the sufficiency of the evidence concerning four of those counts, involving two Hobbs Act bribery schemes (one involving Nicholas Zavarella, a masonry contractor, the other involving John Valentin, the owner of a granite shop) and one fraud scheme (involving Gina Coppers).  As for the rest, Dimora says nothing with respect to the sufficiency of the evidence to convict him.  We may overturn the jury's verdict on these four counts only if, after "viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 310 (1979).

To convict Dimora under the Hobbs Act, the government needed to show that Dimora "obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  *Evans v. United States*, 504 U.S. 255, 268 (1992).  The jury thus had to find that individuals gave Dimora things of value in connection with an "agreement" to take official actions.  *Id.*; *see also Terry*, 707 F.3d at 613.  The jury heard plenty of evidence to convict Dimora on this score—from Dimora's co-conspirators and from the bribers themselves.

Start with the testimony of Russo, the county auditor and a confessed kingpin in this corruption racket.  He testified that Dimora went to great lengths to help Zavarella, because of "all [the things Zavarella had] done for him."  R. 1039 at 164.  The same was true of Valentin.  Russo admitted to entering an agreement with Valentin, in which Valentin would perform granite work at Russo's home for free in return for Russo giving county jobs to Valentin's friends and family members.  Russo then testified that he brokered a similar *quid pro quo* arrangement between Valentin and Dimora.  When Dimora asked if Russo knew any granite workers, Russo told him that Valentin was "very, very, very reasonable."  *Id.* at 177.  Even that turned out to be an under-statement:  All that Dimora had to do for the work was "tip[] the employees" who installed the granite—and provide Valentin with county favors.  *Id.*

Zavarella and Valentin confirmed Russo's version of events.  Zavarella told the jury that he performed more than $30,000 in brickwork at Dimora's home for free.  When asked why he did the work gratis, Zavarella testified that "[Dimora] was a friend and a political official, and I figured if I could help him, I'm sure he could help me."  R. 1037 at 10.  So he could, and so he did.  Dimora helped Zavarella's daughter get a county job, and he gave Zavarella inside information about county construction projects.  On top of this, Zavarella explained that Dimora wanted to hide their agreement by creating false, backdated invoices for the brickwork.  Valentin told a similar story.  He installed granite countertops (worth $3,250) in Dimora's home free of charge, in return for "help" and "favors" from the commissioner.  R. 1036 at 178.  Dimora obliged.  He used his influence to help Valentin's family with immigration green cards and county jobs.  Dimora tried to cover up this arrangement too.  On May 23, 2008, the same day he learned about the FBI investigation, Dimora sent Valentin a $250 check for (some of) Valentin's granite work.  All of this presents "strong circumstantial evidence that [Dimora] had . . . corrupt bargain[s]" with these contractors.  *Terry*, 707 F.3d at 615.

Dimora responds that Zavarella and Valentin exhibited only "generalized hope[s] . . . of ultimate benefit," which do not suffice under the Hobbs Act.  Dimora App. Br. at 54.  But a jury could readily find that the free granite and bricks were not out-of-the-blue gifts designed only to "foster a favorable business climate," particularly in light of Russo's testimony that he engaged in many of the same pay-to-play arrangements.  *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998).  They were things of value given in the expectation that help was on the way, all tied to agreements, not transient hopes.  When Dimora agreed to these schemes, he crossed the line separating gifts from bribes.  *See Terry*, 707 F.3d at 614–15; *United States v. Whitfield*, 590 F.3d 325, 350 (5th Cir. 2009).

Dimora persists that he did not do anything "official" for Valentin.  As Dimora sees it, he simply offered a friend a favor, dropping a letter in the mail to ask one of Ohio's senators for help with a green card.  But Dimora was not just another concerned Ohio citizen.  He was one of three county commissioners, who was not shy about deploying the power that came with the office.  In this instance, he directed a county employee to lobby the senator's staff about the green card.  And in a separate act, he voted to approve extra funds for the county auditor's office

in order to get Valentin's daughter a job.  On this evidence, a reasonable trier of fact could conclude that Dimora used his "public influence" on Valentin's behalf in exchange for home improvements.  *United States v. Abbey*, 560 F.3d 513, 518–19 (6th Cir. 2009).

Dimora's challenge to his fraud conviction fares no better.  "Honest services mail fraud requires the government to prove that the defendant used the mail to carry out a scheme or artifice to defraud another of the intangible right of honest services."  *Terry*, 707 F.3d at 611 (citations and internal quotation marks omitted).  "That intangible right . . . covers only schemes in which the defendant . . . participat[es] in a bribery or kickback scheme," which requires an "agreement to . . . recei[ve] something of value in exchange for an official act."  *Id.* at 611–12 (internal quotation marks omitted).  Plenty of evidence supports Dimora's conviction.  The government introduced intercepted phone calls and other evidence indicating that Dimora shared a $121 hotel room with Coppers and that Coppers footed the bill, all in the context of an agreement to land a government job for Coppers.  And not just any public job.  The calls reveal that Coppers had "very specific" demands "as far as days of the week and amount of salary she wanted and where she wanted to work," if indeed she was expected to work.  R. 1019 at 139.  After their sexual rendezvous, Dimora contacted municipal officials by phone and by mail in an effort to get Coppers employed on her terms.  Hotel rooms, a public official, sexual favors, help finding a government job:  If there is anything to criticize here, it is not that the evidence fails to support the jury's verdict; it is that the saga is so cliché.

Dimora counters that his phone calls and mailings were not official acts because he did not have a role in hiring municipal employees.  Direct role, no; indirect role, yes.  Dimora had considerable influence over such decisions, and he was not afraid to use it.  "Actual authority over the end result . . . is not controlling if [Dimora], through his official position, had influence and authority over a means to that end."  *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993).  Dimora held considerable "influence" and "authority" over city employees.  His votes as commissioner could loosen (or tighten) the county's municipal-funding purse strings.  A rational jury could conclude that Dimora used this power to serve Coppers' interests—and his own.

IV.

Gabor claims that the district court abused its discretion in failing to grant his motion for a new trial, which required him to show that his convictions for bribery, obstruction of justice and RICO conspiracy were against the manifest weight of the evidence. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). No abuse of discretion occurred.

On each contested charge, the government produced more than enough evidence to convict. Begin with the bribery charges surrounding Steven Pumper: Pumper told the jury that he agreed with Gabor to pay kickbacks on contracts awarded to Pumper's company. Continue with the obstruction-of-justice charge: The jury listened to a phone call in which Gabor coached a co-conspirator about what to say to government investigators. "[Y]ou didn't pay for your job," Gabor said, "[and] I didn't pay for my job." R. 1020 at 83. Finish with the conspiracy charge: The jury could take its pick of Gabor's RICO-violating behavior, including job buys, bribery schemes and cover-up attempts. Ample evidence supported these convictions.

Gabor's primary rejoinder is to question the force of some of the evidence. He argues that Pumper's testimony about the kickback scheme was not sufficiently specific, and he contends that one government witness was not credible. But this line of argument invites us into the forbidden territory of re-weighing the evidence. In some settings, it is true, a district court judge, who had a ring-side seat at the trial, may appropriately "act as a thirteenth juror, assessing the credibility of the witnesses and the weight of the evidence." *Hughes*, 505 F.3d at 593. Yet appellate court judges, who have only a transcript to work with, have no such authority. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998); *see also United States v. Poynter*, 495 F.3d 349, 351–52 (6th Cir. 2007). Our task is only to answer whether the district court abused its discretion in reviewing the new trial motion. It did not.

V.

Dimora argues that the district court erred when it excluded from evidence (1) his state ethics reports (and the reports of Russo), and (2) evidence of his noncriminal acts.

*i. Ethics reports.* If admitted, Dimora's end-of-year ethics reports would have shown that he reported receiving "gifts" from several alleged bribers between the years 1997 and 2010. But

the district court considered the reports inadmissible hearsay—out-of-court statements offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Was this error?

Yes, though in the district court's defense Dimora presented a moving target over how he planned to use the reports. Before trial, Dimora vaguely said he wanted to "touch upon" his reports and disclosure requirements. R. 602 at 40. Further discussions of the topic did not clarify matters. After several pre-trial motions on the subject, the district court, quite understandably, noted that it was "unclear . . . the purpose for which [Dimora] would offer" the reports. R. 602 at 40. Only at the trial's end did Dimora settle on a clear admissibility theory: "The financial statements are not being offered for the truth of the matter asserted," he argued, "but [simply] to prove that a statement was made"—that he filed these reports and that, on a line for things of value worth more than $75, he listed several items from several people, including some alleged bribers in the case. R. 894 at 75. At that point, albeit at that late point in the trial, Dimora had offered the reports for a non-hearsay purpose. The district court thus erred when it ruled otherwise.

But the district court not only excluded the reports on hearsay grounds, it also excluded them on Rule 403 grounds, fearing that the introduction of the reports would lead to mini-trials about the purpose of the Ohio ethics reports and the reasons why Dimora listed some things of value from some people but not others from other people.

We need not decide whether this Rule 403 ruling was correct, because either way any error was harmless in view of the considerable array of evidence against Dimora. If a district court incorrectly excludes evidence, we will not reverse unless the error affected the defendant's "substantial rights," Fed. R. Crim. P. 52(a), asking whether "it is more probable than not that the error materially affected the verdict," *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009). To answer that question, we focus on "what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened" at trial. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946); *see also United States v. Lane*, 474 U.S. 438, 449–50 (1986). Exclusion of the reports did not alter the verdict for several reasons.

*First*, the government produced overwhelming evidence against Dimora. It included: incriminating phone calls between Dimora and alleged bribe-payers; testimony from the bribers

themselves admitting to their *quid pro quo* arrangements with Dimora; testimony from co-conspirators, including County Auditor Russo who explained how Dimora's dealings worked and pleaded guilty to charges arising from similar arrangements, indeed in some instances to the same arrangements; circumstantial evidence connecting the bribes received to the favors doled out; and documentary evidence highlighting Dimora's elaborate steps to cover his tracks once he learned the FBI was on his trail. This case had it all. One evidentiary mistake, if a mistake it was, in the context of all else that happened at this 37-day trial would not have made a difference to the jury. *See Lane*, 474 U.S. at 450. Confirming the point, Dimora himself does not even independently challenge the sufficiency of the evidence on 28 of the 32 counts of conviction.

*Second*, Dimora's ethics reports would have done little to tip the scales against the overwhelming weight of this evidence. Keep in mind that the reports *do not contradict a single element* of these public-corruption convictions. The relevant crimes required a *quid pro quo* arrangement—accepting money or other things of value in exchange for official acts. That Dimora apparently reported some $75 things of value says nothing about whether he undertook corrupt bargains. By the end of the trial, moreover, Dimora's limited theory of admissibility was that the reports would not be offered for their truth (i.e., that what he disclosed was in any way accurate or complete), but for the limited fact that he *sometimes* disclosed receiving *some* things from *some* people. Remember also that the ethics reports could not provide the jury much information: The reports required Dimora to disclose all sources of things of value over $75 and "meals, food, or beverages" over $100, but nowhere on the forms did Dimora report *what* items and meals he received or *when* he received them—or *how much* over $75 or $100 the items happened to cost. *E.g.*, R. 940-2 at 150. Nothing about Dimora's limited theory of admissibility would have shown that a single disclosure related to a single bribe. Does the "Kevin Kelley" entry in 2008 mean he disclosed receiving thousands of dollars for first-class plane tickets to Las Vegas? The jurors could not tell, and the ethics report of course disclosed no such detail. Excluding evidence with such limited exculpatory value is the quintessence of harmlessness. *See United States v. Rayborn*, 491 F.3d 513, 518 (6th Cir. 2007).

*Third*, the admission of the ethics reports would have *hurt* Dimora by opening the door to other evidence that would have done him no favors. The ethics reports included the names of

certain alleged bribers.  But others are conspicuously absent from the list.  Where, for example, is Kevin Payne's name?  The evidence showed that he paid for Dimora's use of limousine services, that he covered the cost of prostitutes, and that he picked up the check at more than a few expensive dinners.  What of Gina Coppers?  She paid for Dimora's hotel room.  A jury reading Dimora's reports could only conclude that he was indeed hiding things—and breaking Ohio disclosure laws in the process.  *See* Ohio Rev. Code § 102.02.  Excluding the reports was harm*less* error because including the reports would have been harm*ful.*

Dimora responds (and our colleague notes in dissent) that excluding the reports was not harmless, because "secrecy" was central to the government's case and the government asked several questions at trial about whether Dimora disclosed receiving things of value from alleged bribers.  Yes, the government asked witnesses to describe what Dimora revealed about his dealings with certain contractors.  But no, these questions had nothing to do with Dimora's disclosures to the Ohio Ethics Commission.  The government repeatedly asked county employees whether Dimora disclosed receiving things of value "[d]uring the bid process," R. 1017 at 112, or "[d]uring the time that this project was being considered," R. 1034 at 18.  The point was to show that Dimora made phone calls and held meetings on the bribers' behalf without disclosing the true motive behind the calls and meetings *at the time*.  That Dimora told state officials about "gift" givers a year after the fact does nothing to rebut this point.

Dimora and the dissent persist that the error must have swayed the jury, because during opening statements Dimora's counsel mentioned the reports.  But that statement occurred at a time when Dimora's theory of admissibility remained a moving target.  Dimora's counsel, as it turned out, promised more than the evidence could possibly show, telling the jury that the reports would reveal "everybody that bought him dinner, everybody that gave him things of value."  R. 1010 at 119.  No theory of admissibility would have allowed the ethics reports to be used for that purpose, as Dimora ultimately conceded with his more limited theory of admissibility at the end of trial, and the district court never said otherwise.  Plus, Dimora's counsel promised more than he could have delivered even on his own terms.  As just noted, several bribers' names were never mentioned in the ethics reports.  This simply is not a case in which it is "more probable than not that the error materially affected the verdict."  *Davis*, 577 F.3d at 670.

*ii. Other-acts evidence.*    Not unlike his argument in support of admitting the ethics reports, Dimora also hoped to present evidence of other "good acts"—that on several occasions he helped constituents "without asking for . . . or receiving anything of value."  Dimora App. Br. at 41.   The district court excluded this evidence from trial, ruling that it did not satisfy the requirements of Federal Rule of Evidence 404(b).  Dimora calls this an abuse of discretion.

We disagree.  Rule 404(b) precludes the use of other-acts evidence to "prove a person's character," but it allows such evidence for other purposes, such as proving intent.   Before admitting other-acts evidence for such a non-character purpose, however, the district court must decide whether the evidence is probative of that limited purpose.  *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003).  Dimora's evidence does not hit the target.  All it would have shown is that, in situations unrelated to the charges, Dimora did favors for people who did not pay him bribes.   For the same reason that prior "bad acts" may not be used to show a predisposition to commit crimes, prior "good acts" generally may not be used to show a predisposition not to commit crimes.   Consider *United States v. Qaoud*, a case involving kickbacks in exchange for official favors from a state court judge.  The defendant judge asked to introduce evidence that on one uncharged occasion he refused to help a known "influence peddler."  777 F.2d 1105, 1111 (6th Cir. 1985).  We concluded that the evidence of this "totally different incident . . . demonstrate[d] little or nothing about [the judge's] intent on the charges made in th[e] indictment."  *Id.*  Just the same here.  Regrettably for Dimora, the Latin maxim *falsus in uno, falsus in omnibus*—false in one, false in all—does not have an inverse corollary: true in one, true in all.

Dimora responds with two complaints—one substantive, one procedural.   On the substance, he suggests that his other-acts evidence was relevant to intent, because the government argued that he *always* gave bribe-payers special treatment.  But this was not the government's theory.  The trial, true enough, brought to light a pervasive, deep-seated bribery conspiracy in Cuyahoga County, but the government built its case on agreements between Dimora and a closed circle of bribers.  Dimora's evidence about acts with no connection to these agreements tells us nothing relevant about his case.

As for procedure, Dimora argues that "the court failed to apply any steps of the standard [404(b)] analysis when it addressed Dimora's evidence." Dimora App. Br. at 41. But this argument has been raised and rejected in this circuit. We do not require district courts to follow "a rigid order of battle" when considering other-acts evidence. *United States v. Tasis*, 696 F.3d 623, 628 (6th Cir. 2012). So long as "a court . . . exercise[s] its discretion within the boundaries of the Rule," we will accept the court's decision-making process. *Id.*

## VI.

Gabor argues that the district court erred when it (1) denied his motion to try him separately from Dimora, and (2) imposed a procedurally and substantively unreasonable sentence.

*Motion to sever.* Gabor claims that the district court should have granted a pre-trial motion to sever his trial, because the joint trial caused "spillover prejudice" based on Dimora's bad acts. Gabor App. Br. at 10. Because Gabor did not renew his motion at the close of evidence, the district court's decision must stand unless it plainly erred. *United States v. Talley*, 194 F.3d 758, 765 (6th Cir. 1999).

No error, plain or otherwise, occurred. "Joint trials are favored in this circuit," *United States v. Tocco*, 200 F.3d 401, 413 (6th Cir. 2000), and the "spillover of evidence from one case to another does not require severance," *United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir. 1985). Nor has Gabor shown prejudice to his case. All signs suggest the opposite. The jury did its job, separately evaluating the evidence against the defendants on each count, convicting and acquitting Dimora on some charges, and doing the same for Gabor on others.

*Sentencing reasonableness.* Gabor argues that his 121-month sentence is unreasonable for two reasons: The district court clearly erred when it calculated the amount of loss attributable to his conduct, and it abused its discretion when it gave him a sentence substantially longer than that of his co-conspirators. He is wrong on both fronts.

The Sentencing Guidelines allow a court to increase a defendant's offense level in bribery cases, "[i]f the value of the . . . loss to the government from the offense . . . exceeded $5,000." U.S.S.G. § 2C1.1(b)(2). The court estimated that Gabor spent half of his time

performing legitimate government work for the county auditor. The rest went toward the conspiracy. The government therefore lost 50% of Gabor's salary and benefits for each of his five years in the county's employ—a total of $118,242.89. No doubt, this loss calculation is not a picture of precision. But it does not have to be. A reasonable estimate will do. *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006).

Gabor responds that 50% is an unreasonable estimate, arising out of "sheer speculation." Gabor App. Br. at 61. But that is not what the evidence shows. Kelley testified that Gabor worked only "an hour or two a day" and that he spent the bulk of his time "doing stuff for [Dimora]." R. 1026 at 59. Russo testified that Gabor ran "a lot of errands for [Dimora]" during the workday. R. 1039 at 132. Pumper testified that he saw Gabor swimming at Dimora's house "[t]wo to three times [each work] week." R. 1034 at 247. And Dimora once told Kelley that Gabor "puts in very little time" at the office, calling the job a "jackpot" for Gabor. R. 1026 at 60. Attributing just half of Gabor's salary and benefits as loss when, on this record, the court could have attributed far more does not amount to clear error.

As for his 121-month sentence, it falls within the recommended guidelines range, meaning that we give the sentence a rebuttable presumption of reasonableness. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc). Gabor tries to rebut this presumption by pointing to "disparities" between his sentence and those of his co-conspirators. *See* 18 U.S.C. § 3553(a)(6). But this is not enough. The guidelines concern "*national* disparities between defendants . . . not disparities between co-conspirators." *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010) (internal quotation marks and alteration omitted). And even if that were not the case, the alleged disparities would not help Gabor anyway. Several of the other defendants *cooperated* with the government (e.g., Kelley and Pumper). And all but one of the others pled guilty. Gabor did neither of these things, further justifying the difference between his sentence and theirs. *United States v. Carson*, 560 F.3d 566, 586 (6th Cir. 2009).

## VII.

For these reasons, we affirm Dimora's and Gabor's convictions and sentences.

————————

**DISSENT**

————————

**MERRITT, Circuit Judge, dissenting.**  In this bribery case, I agree with my colleagues that the ethics reports showing disclosure of Dimora's gifts were clearly admissible, but I disagree that their exclusion was "harmless error."

Subjective intent is the keystone of bribery.  The influence of money in politics is growing by leaps and bounds, and the subjective intent of the public official receiving the money is perhaps the last and only distinguishing feature between criminal "*quid pro quo* bribery" and permissible "ingratiation."  The exchange of money for a vote is a crime that threatens the foundation of democracy.  *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976).  The exchange of money for "ingratiation and access is not corruption" at all; indeed, the exchange is so essential to the foundation of democracy that it is protected by the First Amendment.  *McCutcheon v. FEC*, 134 S.Ct. 1434, 1441 (2014) (internal edits omitted).  We are left to distinguish the two as best we can by looking into the subjective intent of the public official.

And by we, I mean the jury.  As Judge Sutton explained in *Terry*, "most bribery agreements will be oral and informal" such that one must build on "inferences taken from what the participants say, mean and do."  707 F.3d 607, 613 (6th Cir. 2013).  Ephemeral "[m]otives and consequences, not formalities, are the keys for determining whether a public official entered an agreement to accept a bribe."  *Id.*  (internal quotation marks omitted).  Fortunately, these are "all matters that juries are fully equipped to assess," as juries are "quite capable of," if not most expert at, "deciding the intent with which words were spoken or actions taken as well as the

reasonable construction given to them by the official and the payor." *Id.* (internal quotation marks omitted).

Disclosure is relevant to an official's subjective intent in bribery cases. Disclosure "offers a particularly effective means of arming the voting public with information." *McCutcheon*, 134 S. Ct. at 1459-60. Information is important if it alerts voters to the potential influences and motives of the officials who hold their trust, so that they (like juries) can build upon facts and inferences to reward or punish at the polls. *Buckley*, 424 U.S. at 66-67. As such, while they do not immunize an official's actions, public disclosures "discourage those who would use money for improper purposes" and "tend to prevent the corrupt use of money" in politics, making such disclosures relevant to an official's intent. *Id.* at 67-68.

My colleagues discount the influence Dimora's disclosures could have had on the jury. They think that the evidence against Dimora was overwhelming and that any error excluding the report is harmless. They ignore, however, facts that are often of more importance to a jury than to an appellate judge. They ignore that the prosecutor promised the jury that she would show a culture of secrecy and nondisclosure shielding Dimora's corruption. They ignore that Dimora promised, after assurance from the district court that the ethics reports could be admitted, to rebut the government's claim by showing the jury reports disclosing Dimora's relationship with his alleged bribers. These reports, Dimora argued, would show a relationship of "ingratiation and access" that may have been deplorable but was arguably legal. They ignore that the district court said in open court before the jury that "it's very important to the government's case to be able to indicate there wasn't any disclosure" of Dimora's political patronage. They ignore that the prosecutor also understood how important the ethics reports were. The prosecution fought tooth and nail, in sidebar and outside of the jury's presence, to keep these ethics reports out of

evidence. Dimora tried to introduce or reference these reports at least four times—during motions prior to trial, before opening arguments, during his case, and at the close of the defense. Dimora argued correctly that the reports were not hearsay and relevant to Dimora's subjective intent. The district court rejected Dimora's correct arguments each time, relying on the prosecutor's incorrect arguments that the reports were either irrelevant, hearsay, or too prejudicial to the government's now-overwhelming case. They ignore that the district court improperly prevented Dimora from following through on his promise to show the jury the fact that he disclosed to the public gifts from a number of the "payors." These facts do not suggest a harmless error, but rather an error that could well have influenced the jury's view of the case.

To what extent the reports would have influenced the jury, I cannot and need not know. As appellate judges, we are not qualified to stack inference on inference for a jury. It is our job to preserve trial by jury and leave such subjective conclusions to the jury. This is precisely why we must lean on harmless error only if we are "sure the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946). Until then, we "will presume that the district court's error was reversible." *United States v. Haywood*, 280 F.3d 715, 724 (6th Cir. 2002). We should not lift the presumption in this case where an individual is otherwise going to prison for 28 years under the Sentencing Guidelines for a nonviolent crime based purely on how a jury of twelve may assess the question of his subjective intent.