<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 18a0077n.06

Case No. 16-2471

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED**<br>Feb 15, 2018<br>DEBORAH S. HUNT, Clerk |
| Plaintiff - Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| JOHN S. BENCHICK, | ) | MICHIGAN |
| | ) | |
| Defendant - Appellant. | ) | |

BEFORE: CLAY, GIBBONS, and COOK, Circuit Judges.

COOK, Circuit Judge. The government alleges John S. Benchick managed to convince two banks to issue five mortgages totaling approximately $7.7 million despite having no appreciable income or assets. Separately, the government claims he persuaded an individual investor to send him some $300,000, which Benchick largely committed to his personal use. After a jury found him guilty of four counts of bank fraud and one count of wire fraud, the district court sentenced him to 110 months' imprisonment and ordered him to pay over $4.8 million in restitution. Benchick appeals, pressing various arguments. We reject them and AFFIRM.

## I. BACKGROUND

### A. Bank Fraud Charges

Benchick submitted one mortgage application in his own name, but, according to the government, he listed the stated borrower on the others as either his father, John I. Benchick, or

his mother, Helen Benchick. The government presented evidence that Benchick's parents had little to do with any of these transactions. Witnesses testified that Benchick alone found the properties, communicated with loan officers, and negotiated the purchases. Additionally, phone numbers on the applications made under his father's name were actually associated with Benchick. Moreover, excess cash from the mortgages found its way into bank accounts Benchick owned or controlled. The government also argued via a physician's affidavit and testimony that Benchick's father had developed severe senile dementia rendering him incapable of comprehending mortgage transactions.

The jury likewise heard evidence of significant discrepancies in the employment status and income figures Benchick reported on the applications. One application listed the senior Benchick as the self-employed owner of a company called "Cobe & Associates, LLC" earning $99,999 per month (or nearly $1.2 million per year). Another lists his monthly income as $95,000. An application the government claimed Benchick submitted in his mother's name notes her income of $45,000 per month, also with Cobe & Associates. On the application he submitted under his own name, Benchick declared monthly income of $60,000.

At trial, the government presented actual tax returns for the Benchicks, revealing that all three made far less than claimed. According to these documents, John I. and Helen Benchick together made approximately $243,000 in 2005 and $359,000 in 2006 (all from passive sources, such as investments and Social Security). Benchick's own tax returns for this period each show negative incomes. Moreover, the government provided evidence—including testimony from Helen Benchick—that both parents had been retired for many years.

Each of John I. and Helen Benchick's "applications" also declares that the mortgaged property would serve as their primary residence. But Helen Benchick herself testified that neither she nor her husband ever moved to any of the purchased properties.

Bank representatives testified to the importance of providing truthful information on loan applications. For example, they told the jury that accurate income reporting is essential for the bank to judge whether a borrower will be able to make his monthly payments. They also testified to the importance of accurate employment history, its relevance to job stability and correlation to a lower risk of default, and the lenders' more favorable view toward primary-residence loans.

The jury ultimately found Benchick guilty of fraudulently inducing two banks to issue five mortgages on three houses (two in Michigan, one in Florida) between 2006 and 2007, totaling more than $7.7 million, including over $1.5 million in cash disbursements.

### B. Wire Fraud Charge

While living in Florida, Benchick met Doug Knoerr, a Michigan farmer, when Knoerr was vacationing in the area and looking to invest in distressed real estate. Knoerr testified that he knocked on Benchick's front door and started talking with Benchick about buying his house. Eventually, Knoerr bought the property with the understanding that Benchick would remain in the home overseeing repairs (using funds Knoerr provided) and preparing to flip it for a profit. Knoerr purchased the house for approximately $950,000. According to the government, he went on to send Benchick over $300,000 more for supposed repair work and as an investment in an illusory electric car project.

Knoerr returned to Michigan, staying in touch with Benchick via phone calls and text messages. Knoerr testified that he occasionally sent Benchick money meant for repairs—

3

$10,000 for a boat lift, $15,000 for the roof, $25,000 for tile and flooring, among other expenses. He eventually became suspicious that Benchick was overcharging him because Benchick refused to provide receipts or bank records documenting completed repairs. Knoerr flew to Florida to take charge of the situation and tried to recoup some of his money from Benchick. Benchick refused, claiming that he had already spent all of Knoerr's money.

The government presented evidence to show that Knoerr's concerns were well-founded. The FBI special agent who investigated the case, Claudia Link, testified about Benchick's cash flow patterns. While he appeared to make some repairs, such payments did not account for all of Knoerr's money. For example, at one point Knoerr sent Benchick $50,000. A few days later, Benchick transferred $50,000 from the same account to pay his criminal defense attorney.[1] Additionally, Benchick's ex-girlfriend, who lived with him in the Florida house during part of the relevant period, testified that Benchick used Knoerr's money to pay his living expenses. She said that she never saw him pay for any house repairs or work on it himself; furthermore, she testified that he told her he only intended to pay Knoerr back if he did "what he wanted him to do."

The government also claimed Benchick cajoled Knoerr into supporting a non-existent electric car battery invention (the "BEV" project). Although Benchick refused to share background information on his invention and did not show Knoerr any blueprints, plans, or a workshop, Knoerr testified that he loaned Benchick $100,000 to "get started" on the project. Benchick himself testified that the project never got off the ground.

---

[1] The government was already prosecuting Benchick for bank fraud by this time.

## II.   ANALYSIS

### A.  Sufficiency of the Evidence

Benchick argues that the jury lacked sufficient evidence to find him guilty of any of his charges.  The district court denied his post-trial motion for acquittal.  We review the district court's decision de novo, with "[a] defendant challenging the sufficiency of the evidence bear[ing] a very heavy burden" of persuasion.  *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014) (quoting *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000)).  In reviewing sufficiency, "[t]he question is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  Benchick can prevail "only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence."  *Id.* (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)).

### 1.  Bank Fraud

To prove bank fraud under 18 U.S.C. § 1344, the government needed to show, first, "that [Benchick] knowingly executed or attempted to execute a scheme to defraud a financial institution"; second, "that [he] did so with the intent to defraud"; and third, "that the financial institution was insured by the FDIC."  *United States v. Warshak*, 631 F.3d 266, 312 (6th Cir. 2010) (quoting *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001)).  Benchick challenges the evidence presented regarding the second element.  To prove intent to defraud, the government needed to show that he "act[ed] with intent to deceive or cheat for the purpose of causing a financial loss to another or bringing about a financial gain to oneself."  *United States v.*

*Kerley*, 784 F.3d 327, 343 (6th Cir. 2015) (quoting *United States v. Olds*, 309 F. App'x 967, 972 (6th Cir. 2009)).

Benchick claims that the loan applications reflect his (and his parents') best efforts to complete the forms properly, although he acknowledges the many seeming discrepancies in the information provided. Specifically, he argues that rather than showing intentional falsity, the evidence demonstrates that the Benchicks listed income figures that incorporated "anticipated profits" from other real estate deals that ultimately fell through. Likewise, he claims that residential address incongruities can be explained by "changing circumstances." Benchick maintains that his father's medical condition thwarted one of his parents' intended moves. He asserts that it was in no way improper to describe any of the Benchicks as owner-employees of "Cobe & Associates," a longtime family business. And he claims that his parents were involved in the transactions, disputing the government's claim that his father was not competent to engage in real estate deals. He points instead to other evidence presented at trial, in particular his mother's and sister's testimony that John I. was mentally fit until shortly before his death. Additionally, his mother testified that she was involved personally in the decision to buy and sell various properties, and that it was her choice to send much of the money from these transactions to her son.

As the government identifies, however, the jury heard testimony from bank officials that mortgage applicants could not use "anticipated income," and that persons with sporadic incomes—such as real estate investors—should have instead calculated monthly income using their average income over the preceding two years. Likewise, the jury weighed Benchick's explanation of the various addresses and claimed primary residences, evidently deciding "changing circumstances" could not account for mortgage applications listing three different

current addresses and three different primary intended residences for his parents (none being their actual home), all within one year's time. And as to employment issues, the government presented substantial evidence that Benchick's parents were retirees and that his father suffered from significant dementia.

Even if plausible, Benchick's proffered alternative explanations remain just that—alternative explanations. The jury heard them and decided differently. The government presented significant evidence on these counts, namely the income and residency discrepancies and the questionable employment statements, combined with evidence of his father's ill health, and the suspicious cash transfers. Viewing that evidence in the light most favorable to the prosecution, we cannot say that no rational jury could have found Benchick guilty beyond a reasonable doubt.

### 2. *Wire Fraud*

For Benchick's wire fraud conviction under 18 U.S.C. § 1343, the government needed to prove that he (1) "'devised or willfully participated in a scheme to defraud'; (2) 'that he used or caused to be used an interstate wire communication in furtherance of the scheme'; and (3) 'that he intended to deprive a victim of money or property.'" *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012) (quoting *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010)).

As to the renovations on the Florida house, Benchick generally claims that far from proving he scammed Knoerr out of hundreds of thousands of dollars, the government's case only shows that Knoerr was "a novice real estate investor" who unsuccessfully tried to exploit "the opportunity to make a quick buck." He alleges that the government has failed to identify "a single false statement" he made to Knoerr to induce him to send money. Additionally, he

maintains that the government failed to prove that Benchick misappropriated Knoerr's money for his own purposes and notes that Knoerr admitted that some work *was* completed on the house.

With respect to the BEV project, Benchick only asserts that the government offered little to no evidence of any intent to defraud and "provided no proof of any link between money paid by Knoerr and the project," with no evidence other than Knoerr's testimony. As the government explains, however, Benchick ignores testimony from other witnesses, namely FBI agent Link, Knoerr's accountant, and Benchick's ex-girlfriend. He also neglects several text messages Benchick sent Knoerr cajoling him to invest in the BEV project.

Benchick's wire fraud arguments, like his arguments regarding the bank fraud charges, amount to innocent explanations for suspicious conduct. He presented those arguments to the jury, which rejected them in light of substantial evidence offered by the prosecution. It is not our place to second guess its judgment; we decline Benchick's "invit[ation] . . . into the forbidden territory of re-weighing the evidence." *United States v. Dimora*, 750 F.3d 619, 627 (6th Cir. 2014).

### B.  Selective Admission of Text Messages

As noted, Benchick and Knoerr corresponded by text message. The government used some of Benchick's messages to Knoerr as evidence, with other messages redacted. The district court decided that these messages were admissible as non-hearsay statements by a party-opponent, and Benchick did not challenge this characterization at the time. *See* Fed. R. Evid. 801(d)(2)(A). Benchick asked the court to admit all text messages in the conversations, not just the ones "cherry pick[ed]" by the government. His counsel argued Benchick ought to be able to introduce all of the messages to give the jury a "full understanding" of the conversation. Although his trial counsel did not cite the rule at the time, Benchick now asserts that this

8

exchange with the district judge was "unmistakably an argument that the texts not introduced by the Government should be admitted under Federal Rule of Evidence 106." Rule 106 expresses the "rule of completeness," and states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time."

As Benchick admits, the rule of completeness cannot trump the hearsay rules. *United States v. Holden*, 557 F.3d 698, 706 (6th Cir. 2009). The district court denied Benchick's request, apparently deciding that the other texts would be hearsay outside the scope of Rule 801(d)(2)(A) (which only applies to statements "offered against an opposing party") because they would have been offered as exculpatory statements.

Now, for the first time, Benchick characterizes his texts as non-hearsay "verbal acts." He contends that if the texts were not hearsay, then the other, redacted texts would have been properly admissible under Rule 106 (assuming no other factors that would have precluded their admission). Because he never raised this argument below, we review for plain error, requiring Benchick to show an "obvious" error that "affect[ed] [his] substantial rights" and "seriously affect[ed] the fairness or integrity of judicial proceedings." *United States v. Pritchett*, 749 F.3d 417, 436 (6th Cir. 2014) (quoting *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006)). As the Supreme Court has cautioned, "the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Young*, 470 U.S. 1, 15 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)).

Even if we agreed that the district court committed an "obvious" error, we are not persuaded it seriously affected the fairness or integrity of the trial such that failure to reverse and

remand would result in a "miscarriage of justice." *Id.* (quoting *Frady*, 456 U.S. at 163 n.14). Most evidence on the wire fraud charge came through the testimony of Knoerr, Knoerr's accountant, FBI agent Link, and Benchick's ex-girlfriend. The texts were only introduced on Knoerr's redirect examination after defense counsel misleadingly asked Knoerr if "nothing in the texts say anything about BEV; is that correct?" and Knoerr replied "Yes, sir." Overall, the text messages played a minor role in the government's otherwise-substantial wire fraud case.

### C. Lack of Specific Unanimity Instruction on Wire Fraud Charge

The jury instructions for the wire fraud charge did not distinguish between alleged fraud as to the house renovations and alleged fraud as to the BEV project. Instead, the district court provided a generalized instruction, reciting the elements of the offense and referring only to "a scheme to defraud."

Benchick now charges that the court should have provided a specific unanimity instruction on this count. As he sees it, the wire fraud charge is bifurcated: the government could only prevail if it proved that he either defrauded Knoerr with respect to the house repairs or with respect to the BEV project (or both). He argues that because there was no unanimity instruction, some jurors could have decided he committed wire fraud for the house repairs but not the BEV project, while different jurors could have convicted based on their conclusion that he committed wire fraud for the BEV project but not the house repairs.

Because Benchick did not request a specific unanimity instruction below, we limit ourselves to plain error review, deciding "whether the instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice." *United States v. Miller*, 734 F.3d 530, 538 (6th Cir. 2013) (quoting *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992)). "[A]n improper jury instruction will rarely justify reversal of a criminal conviction when no

objection has been made at trial, . . . and an omitted or incomplete instruction is even less likely to justify reversal, since such an instruction is not as prejudicial as a misstatement of the law." *Id*. (quoting *United States v. Rayborn*, 491 F.3d 513, 521 (6th Cir. 2007)) (alterations in original). A specific unanimity instruction is required only where:

> (1) the nature of the evidence is exceptionally complex or the alternative specifications are contradictory or only marginally related to each other; or (2) there is a variance between indictment and proof at trial; or (3) there is tangible indication of jury confusion, as when the jury has asked questions or the court has given regular or supplementary instructions that create a significant risk of nonunanimity.

*Id*. (quoting *United States v. Damra*, 621 F.3d 474, 504–05 (6th Cir. 2010)).

Benchick argues this case falls into the first category, claiming that the alternative specifications "had no connection" to each other. The government responds that "the schemes were integrated and carried out simultaneously"—that Benchick defrauded Knoerr regarding the real estate deal and the BEV project at the same time, and that he received money for both during the same time period. The government claims that the schemes were therefore more than "marginally related" to each other.

Even if we agreed with Benchick that the district court should have given a unanimity instruction, there was no plain error here due to the absence of evidence that failing to so instruct caused "a grave miscarriage of justice." *United States v. Thomas*, 74 F.3d 701, 712 (6th Cir. 1996) (quoting *Sanderson*, 966 F.2d at 187). The "touchstone" for reversible error for failure to give a unanimity instruction "has been the presence of a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." *Damra*, 621 F.3d at 505 (quoting *United States v. Duncan*, 850 F.2d 1104, 1114 (6th Cir. 1988)). Benchick's challenge on this point must fail because there is no evidence that Benchick's jury was confused or at risk of delivering a patchwork verdict. *See id*.

## D. Calculation of Sentencing Range

Benchick also disputes several aspects of the district court's calculation of his sentencing range. The court determined Benchick's case warranted a total offense level of thirty-six, with a criminal history category of one, resulting in a sentencing range of 188 to 235 months. We review the court's factual findings for clear error and its legal conclusions de novo. *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007).

First, Benchick argues that the court incorrectly calculated the losses attributable to his actions. The court calculated an actual loss of $4,812,759, requiring an eighteen-level enhancement under the sentencing guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(J) (adding eighteen levels for losses between $3.5 and $9.5 million). This loss calculation includes nearly $2.5 million for the houses in Michigan and over $2.3 million for the Florida house. The guidelines call for losses to be calculated as the greater of either "actual" or "intended" losses, with "actual loss" defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 app. 3(A). Benchick admits to the losses attributable to the Michigan properties, but claims that the court should have excluded losses associated with the Florida house because there were no "actual losses" related to that home. Citing no authority, he asserts that because the bulk of the lender's loss on the Florida house came through a short sale to Knoerr of $950,000 (on a $2,925,000 mortgage), and because a short sale "does not necessarily implicate a loss to the mortgagor attributable to criminal activity," the court should have excluded the resulting $1,975,000 loss to the lender from its loss calculation.[2]

---

[2] He also claims that the government failed to prove losses on the Florida home with any particularity, arguing that the calculation should have taken into account the value of any renovations Benchick completed, plus Knoerr's "gain" for "buying a house for under market value as a result of the financial distress of the prior owner." Because Benchick only raises these

Yet, as the government points out, Benchick himself admitted at sentencing that the lender agreed to "a short payoff, not a short sale, for $950,000." Moreover, no matter how the sale was structured, the fact remains that the bank loaned nearly $3 million to Benchick's father based on a loan application that formed part of the basis for Benchick's conviction. The bank ultimately lost nearly $2 million on this loan. Benchick fails to demonstrate that the district court clearly erred in considering this aspect of the financial damage he caused. *See Kerley*, 784 F.3d at 347 ("Under the circumstances, where there is no evidence that the lenders failed to mitigate their losses by unreasonably delaying the ultimate sale of the properties, we cannot fault the district court for basing its § 2B1.1 loss calculation on the difference between the amount loaned and the amount eventually recovered by selling the properties securing the loan.").

Second, he claims the district court improperly applied a two-level enhancement for the use of "sophisticated means" under section 2B1.1(b)(10)(C) of the guidelines. According to Benchick, his offenses "were no more sophisticated than those in any bank or wire fraud scheme." But, as the application notes to the guidelines make clear, "[c]onduct such as hiding assets or transactions, or both, through the use of . . . corporate shells . . . also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 app. 9(B). The government argues that Benchick's use of companies like Cobe & Associates as his parents' supposed employer and as conduits for the proceeds of his schemes justifies the application of the enhancement. Benchick's retort that the companies were more than mere "shells" because he and his father had conducted legitimate business through them for years prior to the events of this case misses the point. The fact remains that the court had clear evidence that Benchick used corporate entities in furtherance of

arguments in his reply brief, however, we decline to address them. *See United States v. Galaviz*, 645 F.3d 347, 362 (6th Cir. 2011).

13

his criminal activities. *Cf. United States v. Erwin*, 426 F.App'x 425, 437 (6th Cir. 2011) (holding that "funneling of transactions through relatives in order to disguise the origin of funds is sufficient to support an enhancement for sophisticated means." (citing *United States v. May*, 568 F.3d 597, 607 (6th Cir. 2009))).

Third, Benchick received a two-level enhancement because he collected over $1 million in gross receipts from one or more financial institutions. *See* U.S.S.G. § 2B1.1(b)(16)(A). He argues this enhancement is inappropriate because the trial evidence shows that he received only $755,000 in cash proceeds from the various mortgages. Although the cash proceeds from the mortgages on each property far exceeded $1 million,[3] and the government presented evidence showing that these proceeds eventually made their way into accounts Benchick either owned or controlled, he claims that these calculations "do not account for any money that [he] put towards the real estate transactions." But he provides no explanation of the specific alleged defects in the district court's calculation, and his briefing lacks any discussion of how he arrived at his own figure. Such conclusory allegations cannot persuade us that the court clearly erred in applying this enhancement.

Fourth, Benchick contests the court's application of a three-level enhancement for committing an offense while released on bond. *See* U.S.S.G. § 3C1.3. Citing no authority, he claims that this enhancement, triggered by Benchick's conviction for wire fraud, is inappropriate because, according to the indictment, he started defrauding Knoerr before his initial arraignment on bank fraud charges. As the government notes, however, even if the criminal conduct started

---

[3] The two mortgages on the Florida house together remitted over $1 million to Benchick's father. His mother's mortgage on one of the Michigan houses included nearly $220,000 in cash to the borrower, and his father received nearly $293,000 in cash from his mortgage on the other Michigan house.

before his arraignment, he continued to defraud Knoerr long afterwards—to the tune of some $200,000 (or approximately two-thirds of the total amount he obtained from Knoerr). We see no reason to depart from the district court's conclusion that "the totality of the behavior in Count 5 occurred, actually the bulk of the behavior under Count 5 occurred post-arraignment and during the time that he was on bond." The enhancement is therefore justified.

### E. Restitution Calculation

Finally, Benchick challenges part of his restitution order. The court ordered him to pay $4,175,333 to J.P. Morgan Chase as successor in interest to Washington Mutual, one of the lenders. Benchick raises the equitable principle of unclean hands, arguing that Washington Mutual was reckless in reviewing and approving mortgage applications like his. He waived this argument at sentencing, however, when his counsel expressly agreed to the court's proposed restitution order, only preserving possible objections to the *amount* of restitution, not J.P. Morgan's *entitlement* to restitution. *See United States v. McBride*, 826 F.3d 293, 294–95 (6th Cir. 2016) ("A defendant waives the argument that a sentencing enhancement does not apply by 'explicitly agreeing' that it does, such as through 'plain, positive concurrence.'" (quoting *United States v. Knox*, 593 F. App'x 536, 536, 537 (6th Cir. 2015))).

### III.  CONCLUSION

For these reasons, we AFFIRM Benchick's convictions, including his sentence and restitution.