NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0375n.06

Case Nos. 13-3240/3525

FILED
May 26, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| VINESH DARJI; AUDREY BARBARA | ) | OHIO |
| ROVEDO, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | OPINION |

BEFORE: MERRITT, MOORE, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** This prosecution under the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq*., involved a conspiracy to distribute Schedule III and Schedule IV controlled substances—primarily hydrocodone and alprazolam— via the internet from 2005 to 2009. Defendants-Appellants Audrey Barbara Rovedo ("Rovedo") and Vinesh Darji ("Darji") are two of twelve individual defendants charged in this case. The government charged both Rovedo and Darji with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, as well as several counts of unlawful drug distribution, in violation of 21 U.S.C. § 841. The government also charged Rovedo with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). After a nearly two-month trial, the jury

found Rovedo and Darji guilty on all charges. The district court sentenced Rovedo and Darji to 78 months and 58 months in prison, respectively.

In this consolidated appeal, Rovedo and Darji challenge their convictions. Rovedo also challenges the reasonableness of her sentence and the district court's order of forfeiture against her. For the reasons discussed below, we **AFFIRM** the judgments of the district court.

## I. BACKGROUND

### A. *Factual Background*

The government alleged that, from 2005 to 2009, James Hazelwood ("Hazelwood") and his company, USMeds, LLC ("USMeds"), operated an "internet pill mill." The operation connected doctors willing to write illegitimate prescriptions, pharmacists (including Darji) willing to fill those prescriptions, and a business enterprise—Rovedo's "Delta Health" organization—that processed online orders, attracted customers, and recruited other doctors and pharmacists. Darji filled orders from the Hazelwood organization using two of his Tampa, Florida-based pharmacies, Medicom Rx and The Medicine Shoppe. The doctors participating in the conspiracy included Dr. Dora Fernandez (based in Puerto Rico), Dr. Edward Cheslow (based in New York), Dr. Felix Llamido (based in Florida), and Dr. Terence Sasaki (based in New Jersey).

Beginning in August 2005, Hazelwood created websites and engaged affiliate websites to solicit customers seeking to order prescription pain pills online. The websites utilized metatags such as "hydrocodone no prescription" in order to populate on internet search engines. The primary drug sold in the conspiracy was hydrocodone, an addictive painkiller. Hazelwood's operation charged customers a price up to ten times higher than retail cost for the drugs it provided.

When a customer accessed Hazelwood's websites, she would select the type of drug, the strength, and the quantity desired. The ordering system was set up so that participating doctors could not change or alter the type, strength, or amount of medication requested by the customer. After selecting a shipping method and providing payment information (the operation did not accept health insurance), the customer would fill out a short questionnaire before submitting her order. The website would then send an email to the customer directing her to fax in copies of her driver's license and medical records to Delta Health, the call center owned and operated by Rovedo that processed customer orders and managed the organization's doctors. Upon receiving the fax, a Delta Health customer service representative would contact the customer to schedule a telephone "consult" with a doctor the customer had never before met. These consultations were brief, and the vast majority of hydrocodone orders were approved; Dr. Fernandez regularly authorized between 700 and 900 hydrocodone prescriptions per week. Delta Health would then send the customer's order to one of the pharmacies working with the conspiracy, which filled the order and shipped it to the customer's residence. Approximately twenty-five days after filling the customer's order, Delta Health would send repeated emails soliciting the customer to refill her prescription.

Undercover buys by federal agents illustrated that the operation's review of medical records was a sham. For example, undercover agents were able to obtain hydrocodone from the organization using medical records allegedly submitted by a pregnant man. Another agent submitted medical records in the name of "Park Rover," whose chief medical complaints involved pain resulting from running into a fence while chasing a ball, heartworms, and excessive barking. Rover, who apparently lived at "1523 Bark Street" and was under the care of Dr. Zachary Shihtzu, listed his current medications as Kyltix (a substance used on dogs to repel

or kill ticks) and Nylabone (a canine chew toy). In spite of the strong indication from Rover's medical records that he was a dog, Rover nevertheless successfully completed three orders of hydrocodone.

In 2006 and 2007, the Drug Enforcement Administration ("DEA") conducted administrative inspections of pharmacies filling orders for the Hazelwood organization. It also pressured hydrocodone wholesalers to cease supplying the drug to pharmacies with abnormally high-volume ordering patterns. To avoid increasing scrutiny, the Hazelwood organization instituted a "50/50 ratio" policy, under which customers were required to order non-controlled pain relievers, like ibuprofen, along with the controlled substances they wished to purchase. Darji and Rovedo both participated in the operation's recruitment efforts, which were mostly unsuccessful.

Between August 2005 and May 2007, Darji filled approximately 17,000 prescriptions for the Hazelwood organization. For his efforts, Darji received approximately $1 million, consisting mainly of inflated "fill fees" of $20 to $25 per order—more than ten times the national average. The vast majority of the orders Darji filled were for hydrocodone at the highest commercially available strength. Darji's distribution totals included: over 1.5 million hydrocodone pills to customers of Dr. Fernandez in 49 states and Washington, DC; nearly 400,000 hydrocodone pills to customers of Dr. Cheslow in 38 states; over 220,000 hydrocodone pills to Dr. Llamido's customers in 24 states; and over 76,000 hydrocodone pills to Dr. Sasaki's customers in 44 states and Washington, DC.

Facing supply shortages, Rovedo then came up with the idea of a "direct script" model. This involved participating doctors writing paper prescriptions for hydrocodone, which the Hazelwood organization would ship directly to the customer, who could take the prescription to

her local pharmacy to be filled. Under this arrangement, Rovedo split the "consult fees" charged to customers evenly with Hazelwood. Rovedo paid several hundred thousand dollars in proceeds to Hazelwood, as well as more than $700,000 to Dr. Fernandez for authorizing drug orders. In all, the Hazelwood organization completed 45,000 drug orders totaling more than three million pills.

### B.     *Procedural History*

On April 27, 2010, a federal grand jury in the Northern District of Ohio returned a 37-count indictment against twelve individual defendants and two business entities. The indictment named Rovedo and Darji in the drug-conspiracy count, as well as several counts of unlawful drug distribution. Rovedo also was charged with conspiracy to commit money laundering. Hazelwood and Dr. Fernandez pleaded guilty and agreed to cooperate with the government by testifying at Rovedo and Darji's trial. Prior to trial, the district court denied Rovedo's motion to dismiss the indictment against her, as well as Darji's motion to dismiss the indictment for violating the Due Process Clause of the Fifth Amendment.

The trial in this case began in September 2012 and lasted nearly two months. On November 15, 2012, the jury returned a verdict of guilty on all of Rovedo and Darji's charges. On February 13, 2013, the district court denied Darji's motion for a new trial. Two days later, the court sentenced Darji to 58 months' imprisonment. On April 18, 2013, the district court sentenced Rovedo to 78 months' imprisonment. On July 12, 2013, the court entered an order finding Rovedo jointly and severally liable with her co-conspirators for $3,589,890 in forfeitable proceeds. The court entered an amended judgment to that effect. Rovedo and Darji timely appealed.

## II.       ANALYSIS

### A.       *Rovedo*

On appeal, Rovedo challenges (1) the district court's denial of her motion to dismiss the indictment against her; (2) the procedural and (3) substantive reasonableness of her sentence; and (4) the district court's forfeiture order against her.

### 1.       *The District Court Did Not Err by Denying Rovedo's Motion to Dismiss the Indictment*

Rovedo argues that the district court should have granted her motion to dismiss the indictment against her because the government failed to preserve the electronic medical records of Delta Health's clients, including medical records and prescription histories, in a readable format. She asserts that the government's key cooperating witness, Hazelwood, controlled the missing documents and that the government took no affirmative steps to obtain this evidence, which may have proven exculpatory. The government responds that it never controlled the relevant records and that it provided copies of the raw data it was able to recover from a third-party server to Rovedo. Neither the government nor Rovedo were able to reconstruct the records. The government argues that, in any event, it is unlikely that any recoverable medical records would be exculpatory for Rovedo. We agree with the government.

"In reviewing a district court's ruling on a motion to dismiss an indictment, this Court reviews the district court's legal conclusions de novo and its findings of fact for clear error or abuse of discretion." *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013). Rovedo's argument, which centers on a factual dispute regarding discovery, is subject to abuse-of-discretion review. This requires Rovedo to demonstrate that the district court's ruling was "based on an error of law or a clearly erroneous finding of fact," or otherwise to leave us "with

the definite and firm conviction that the district court committed a clear error of judgment." *United States v. Kumar*, 750 F.3d 563, 566 (6th Cir. 2014).

In denying Rovedo's motion, the district court credited the government's arguments that much of the raw data it obtained from a third-party subpoena was in an inaccessible format, that it disclosed any information it could glean to Rovedo, and that it did not destroy or fail to preserve any information it had obtained. The record supports the district court's determination. Because the government did not destroy any of the raw data it obtained from the third-party server, Rovedo cannot meet the standards for demonstrating that the government's destruction of material exculpatory evidence arose to the level of a due process violation. *See California v. Trombetta*, 467 U.S. 479, 488-89 (1984) (holding that destruction of evidence violates due process where the evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means"); *see also United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001) (noting that "destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith"). Moreover, because the government did what it could to convert the raw data—which was only potentially useful—into a readable format and provided the raw data to Rovedo, Rovedo cannot show that the government acted in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *Wright*, 260 F.3d at 571-72 (noting that "where the government is negligent, even grossly negligent, in failing to preserve potential exculpatory evidence, the bad faith requirement is not satisfied").

2.      *Rovedo's Sentence Is Procedurally Reasonable*

Rovedo next argues that the district court made two procedural errors in its Guidelines calculation at sentencing: first, that the district court applied the wrong base offense level under U.S.S.G. § 2D1.1(c) by erroneously determining that the conspiracy was responsible for the distribution of more than three million[1] dosage units of hydrocodone; and second, that the district court erred in assessing Rovedo as an organizer or leader of the conspiracy under U.S.S.G. § 3B1.1(a).

We review challenges to the procedural and substantive reasonableness of a sentence under the deferential abuse-of-discretion standard. *United States v. Kamper*, 748 F.3d 728, 739 (6th Cir. 2014); *Gall v. United States*, 552 U.S. 38, 51 (2007). To determine whether a sentence is procedurally reasonable, we examine, inter alia, "whether the district court properly calculated the Guidelines range." *United States v. Battaglia*, 624 F.3d 348, 350-51 (6th Cir. 2010). "If the district court misinterprets the Guidelines or miscalculates the Guidelines range, then the resulting sentence is procedurally unreasonable." *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012). The district court's "legal interpretation of the Guidelines [is] reviewed de novo, but its factual findings are reviewed under the clearly erroneous standard." *Id.* (quoting *Battaglia*, 624 F.3d at 351) (internal quotation marks omitted). Sentencing factors must be established by a preponderance of the evidence. *United States v. Ross*, 703 F.3d 856, 884 (6th Cir. 2012).

a.      *The District Court's Calculation of Rovedo's Base Offense Level Was Not Erroneous*

Pursuant to § 2D1.1(c)(10) of the 2008 version of the Sentencing Guidelines, Rovedo's base offense level was capped at 20 for the distribution of 40,000 or more units of Schedule III

---

[1]Although Rovedo's brief argues that the district court estimated the conspiracy distributed more than four million dosage units, the court's actual finding was "that more than 3 million dosage units were involved here."

substances.[2]  Rovedo argues that the district court should only have considered the number of pills distributed to undercover agents in determining her base offense level because that number was readily calculable.  She argues that she did not enter the conspiracy until January 2006, when she and her husband purchased Delta Health, meaning that she cannot be held responsible for the full amount of drugs attributable to the conspiracy.  She further argues that the government did not prove that every hydrocodone pill distributed in the conspiracy was medically unnecessary, thereby rendering the more-than-three-million figure inflated.  The government responds that the district court's calculation was not erroneous because ample evidence demonstrated that the prescriptions issued by Delta Health doctors were illegitimate. The government's argument prevails.

In reviewing a district court's drug-quantity determination for purposes of sentencing, "[s]o long as a preponderance of the evidence supports the district court's finding, an estimate will do."  *United States v. Sadler*, 750 F.3d 585, 593 (6th Cir. 2014).  This Court should not disturb this estimate if competent evidence in the record supports it.  *United States v. Mahaffey*, 53 F.3d 128, 132 (6th Cir. 1995).  As a factual finding, we review drug-quantity determinations for clear error.  *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008).

In determining that Rovedo was responsible for the distribution of more than three million hydrocodone pills, the district court considered and accepted Rovedo's argument that she could not be responsible for the shipment of any hydrocodone before 2006, when she purchased Delta Health.  In doing so, the district court rejected the recommendation in the presentence investigation report that the court hold Rovedo responsible for the distribution of more than four

---

[2]Under U.S.S.G. § 1B1.11(b)(1), the district court applied the 2008 version of the Guidelines because, beginning in 2009, the maximum base offense level for hydrocodone offenses increased from 20 to 30.  *Compare* U.S. Sentencing Comm'n, *Guidelines Manual*, § 2D1.1(c)(10) (Nov. 1, 2008), *with* U.S. Sentencing Comm'n, *Guidelines Manual*, § 2D1.1(c)(5) (Nov. 1, 2009).

million pills. This indicates caution by the district court to ensure that Rovedo "was 'more likely actually responsible for a quantity greater than or equal to the amount used in calculating the sentence.'" *Jeross*, 521 F.3d at 571 (quoting *Mahaffey*, 53 F.3d at 132). Ultimately, this determination rested on evidence in the record that Rovedo, along with others, operated under the following business model, as described by the district court:

> that scripts were written with persons having asked for hydrocodone initially; that a very small amount of medical evidence was obtained, that very little medical time was spent with them, that this was understood by Ms. Rovedo, and that the scripts were obtained with very little medical rigor or observation.

Competent evidence in the record supported a finding that Rovedo was responsible for the distribution of hundreds of thousands, if not millions, of hydrocodone pills. Trial testimony indicated that Delta Health doctors did not establish an appropriate doctor-patient relationship prior to dispensing medication; that calls between undercover agents and the Delta Health organization regarding symptoms were superficial and vague; that undercover agents were able to receive medication using obviously falsified medical records; and that the Delta Health organization sent periodic emails urging customers to renew or refill their medications. A trial exhibit indicated that Dr. Fernandez filled over 4,000 prescriptions totaling more than 400,000 hydrocodone pills at one of Darji's pharmacies from 2006 to 2007. Moreover, an email from Rovedo to Hazelwood expressed "a real problem" with a doctor "insisting that he doesn't want patients to have Rx for hydro for more than 3-4 months at a time without a 30 day break," and suggested transferring customers to other doctors as a workaround. At bottom, the district court's conservative estimate was not clearly erroneous, and was certainly over the 40,000 threshold required to assess Rovedo with a base offense level of 20 under the 2008 Guidelines.

        b.        *The District Court's Determination That Rovedo Was an Organizer or Leader of Criminal Activity Involving More than Five Participants Was Not Erroneous*

Rovedo also argues that the district court erred in determining that she was an organizer or leader of the conspiracy for purposes of a four-point enhancement under U.S.S.G. § 3B1.1(a). Under that section, a four-level enhancement is appropriate if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). According to Rovedo, the record only shows that she purchased an ongoing medical records business that had Hazelwood as a client. She argues that she did not exercise authoritative decisionmaking in the conspiracy, that the doctors involved exercised their own independent medical judgment, and that, while she may have played an essential role, the government failed to prove that she played a managerial role. The government argues that the evidence adduced at trial demonstrated that Rovedo was an equal partner with Hazelwood, responsible for monitoring the performance of participating doctors and adjusting customer loads as necessary. The record supports the government's argument.

A deferential clear-error standard of review applies to a district court's determination that a person is an organizer or leader under U.S.S.G. § 3B1.1. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). This is because "a Section 3B1.1 enhancement . . . depends on a number of factual nuances that a district court is better positioned to evaluate." *Id.*; *see also id.* ("The district court is in the best position to know whether [a defendant] was a leader or organizer under Section 3B1.1 given the evidence presented and the nature of the conspiracy."). To determine whether a defendant should receive an "organizer or leader" enhancement under § 3B1.1(a) rather than a lesser "manager or supervisor" enhancement under § 3B1.1(b), we consider the following non-exhaustive list of factors:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* (quoting U.S.S.G. § 3B1.1 cmt. n.4) (internal quotation marks omitted).

The district court did not clearly err in determining that Rovedo was an organizer or leader of the conspiracy. The court properly applied the factors for determining management of a criminal organization. *Cf. United States v. Lalonde*, 509 F.3d 750, 765-66 (6th Cir. 2007). Recognizing that Rovedo did not start out as a leader of the conspiracy, the district court nevertheless focused on Rovedo's roles in communicating with Hazelwood regarding the logistics of the conspiracy, in recruiting doctors and terminating those who did not cooperate with the plan, and in formulating the "direct script" model.

The record supported the district court's determination. For example, telephone calls between Hazelwood and Rovedo indicated that it was Rovedo's responsibility to monitor the customer loads of each doctor and to adjust them as necessary. Only Hazelwood and Rovedo had access to the doctor queues to accomplish this task. Emails between Hazelwood and Rovedo further demonstrated that Rovedo was responsible for recruiting doctors willing to participate in the conspiracy. Telephone calls indicated that Rovedo came up with the "direct script" model in order to alleviate problems with pharmacies not filling prescriptions written by the conspiracy's doctors, and that she pitched the model as "a cleaner business" to participating doctors. Rovedo also suggested using her son to see if a pharmacy in California would fill a prescription written by Dr. Fernandez under the "direct script" model. Hazelwood agreed to split the profits from the "direct script" model down the middle with Rovedo "like a partner," recognizing that the model would "put a brunt of the burden on [Rovedo]." The fact that Rovedo received a large portion of the fruits of the crime, *see* U.S.S.G. § 3B1.1 cmt. n.4, coupled with the other overwhelming

evidence of Rovedo's leadership role, suffices to show that the district court's application of the four-level enhancement was not clearly erroneous.

### 3. *Rovedo's Sentence Is Substantively Reasonable*

Rovedo also challenges the substantive reasonableness of her sentence. Rovedo argues that the district court erred by failing to grant downward departures or variances for (1) aberrant behavior under U.S.S.G. § 5K2.20; (2) her medical conditions under § 5H1.4; and (3) the disproportionality of her sentence as compared to the sentences of her co-defendants.

We review challenges to the substantive reasonableness of a sentence for abuse of discretion. *Kamper*, 748 F.3d at 739. "[A] sentence may be substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent [18 U.S.C.] § 3553(a) factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Robinson*, 503 F.3d 522, 528 (6th Cir. 2007). Sentences falling within the advisory Guidelines range are presumptively reasonable. *United States v. Vonner*, 516 F.3d 382, 389-90 (6th Cir. 2008) (en banc); *see also Rita v. United States*, 551 U.S. 338, 347 (2007).

### a. *The District Court Did Not Err by Failing to Grant Rovedo a Downward Departure or Variance for Aberrant Behavior*

Rovedo first argues that the district court should have granted a downward departure or variance under U.S.S.G. § 5K2.20 because she had not engaged in any other criminal conduct prior to her participation in the conspiracy. A downward departure under § 5K2.20 is appropriate "only if the defendant committed a single criminal occurrence or a single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." The government responds that Rovedo's long-lasting participation in this conspiracy—including her

schemes to evade law enforcement and her introduction of the "direct script" model—disqualify her from a § 5K2.20 departure. We reject Rovedo's argument.

"In this circuit, a district court's decision not to depart downwards is considered unreviewable, except where there is clear evidence that 'the lower court incorrectly believed that it lacked authority to grant such a departure.'" *United States v. Church*, 731 F.3d 530, 533-34 (6th Cir. 2013) (quoting *United States v. Madden*, 515 F.3d 601, 610 (6th Cir. 2008)). If the district court recognizes its discretion—as did the district court here—then we will review the court's decision only if: "(1) the sentence was imposed in violation of the law; (2) it was imposed as a result of an incorrect application of the guidelines; (3) the sentence represented an upward departure; or (4) the sentence was imposed 'for an offense for which there is no Sentencing Guideline and is plainly unreasonable.'" *United States v. Puckett*, 422 F.3d 340, 346 (6th Cir. 2005) (quoting 18 U.S.C. § 3742(a)). The district court recognized its discretion to grant a downward departure under § 5K2.20 and specifically declined, focusing on Rovedo's extensive planning in the offense. In view of this, the district court's decision to deny a departure is unreviewable. *See Church*, 731 F.3d at 534. Moreover, the district court did not abuse its discretion in denying a variance under these circumstances.

> b. *The District Court Did Not Err by Failing to Grant Rovedo a Downward Departure or Variance Based on Her Health Conditions*

Rovedo next argues that the district court should have granted a downward departure or variance based on her age and poor health conditions, pursuant to U.S.S.G. § 5H1.4. Under that section, "an extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." Rovedo argues that her myriad health complications—including degenerative joint disease, hypertension, osteoporosis, depression, and anxiety—warranted a downward

variance. The government responds that evidence from the Bureau of Prisons ("BOP") demonstrated that it could adequately care for Rovedo and accommodate her medical conditions, such that the district court's refusal to grant a departure or variance on this ground was not an abuse of discretion. The latter argument is more persuasive.

As with the § 5K2.20 departure, the district court expressly recognized its discretion to grant a departure to Rovedo based on her health conditions under § 5H1.4, but specifically declined to do so based on the circumstances of her case. Under this Circuit's well-established law, therefore, the district court's decision is unreviewable. *See Church*, 731 F.3d at 533-34. Even if it were reviewable as a request for a variance, however, competent evidence supported the district court's decision, including an assessment from the BOP indicating that it could accommodate Rovedo's conditions. Rovedo did not establish that her medical conditions were so extraordinary as to warrant a downward variance.[3] *See United States v. Jones*, 445 F.3d 865, 870 n.7 (6th Cir. 2006) (noting that, absent extraordinary circumstances, "[t]he Guidelines discourage courts from considering a defendant's physical condition in determining whether a departure may be warranted"); *United States v. Johnson*, 71 F.3d 539, 545 (6th Cir. 1995) ("[A]n aged defendant with a multitude of health problems may qualify for a downward departure under § 5H1.4. However, we note that such downward departures are rare."). Accordingly, Rovedo has not rebutted the presumed reasonableness of her sentence. *See Vonner*, 516 F.3d at 389.

> c.  *The District Court Did Not Err by Failing to Grant Rovedo a Downward Variance Based on the Disproportionality of Her Sentence as Compared to the Sentences of Her Co-Defendants*

Rovedo argues that the sentence she received was disproportionately higher than those received by her co-defendants. She argues that her 78-month sentence was unfair in light of the

---

[3]In any event, the district court explicitly sentenced Rovedo at the low end of her advisory Guidelines range based exclusively on her medical conditions.

fact that Dr. Fernandez received a 30-month sentence, and that the ringleader of the conspiracy, Hazelwood, received a 110-month sentence. The government argues that Rovedo was second only to Hazelwood in her culpability and that her case is not comparable to her co-conspirators' cases because all of them (except Darji and Sasaki) pleaded guilty and accepted responsibility for their crimes. The government has the better argument.

As noted above, within-Guidelines sentences are entitled to a presumption of reasonableness. *Vonner*, 516 F.3d at 389. We recently rejected a similar attempt by a defendant "to rebut this presumption by pointing to 'disparities' between his sentence and those of his co-conspirators." *United States v. Dimora*, 750 F.3d 619, 632 (6th Cir. 2014). In *Dimora*, we noted that "[t]he guidelines concern '*national* disparities between defendants[,] . . . not disparities between co-conspirators.'" *Id.* (quoting *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010)). We nevertheless rejected the defendant's argument on its merits, noting that, unlike several of his co-conspirators, the defendant had not cooperated with the government or pleaded guilty. *Id.* Rovedo's case is indistinguishable from *Dimora*. Hazelwood and Dr. Fernandez pleaded guilty and cooperated with the government; Rovedo did not. Moreover, Rovedo's argument fails on its own terms: the district court explicitly considered the reasonableness of Rovedo's sentence relative to her co-conspirators, noting that her sentence was "substantially" below Hazelwood's, but higher than Darji's. Accordingly, Rovedo has failed to rebut the presumption that her within-Guidelines sentence is substantively reasonable.

### 4. *The District Court's Order of Forfeiture Was Not Erroneous*

Finally, Rovedo challenges the district court's order finding her jointly and severally liable, along with her co-conspirators, for $3,589,890 in forfeitable proceeds. She argues that the forfeiture order was improper because she is indigent and suffers from medical impairments that

diminish her ability to pay. She also argues that she did not receive the amount listed in the forfeiture order as ill-gotten gains, but rather received only a reasonable salary. The government responds—correctly—that a defendant's ability to pay is not relevant in the forfeiture analysis.

The criminal-forfeiture statute provides that an individual convicted of a drug offense "punishable by imprisonment for more than one year shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as a result of such violation." 21 U.S.C. § 853(a)(1). We must construe § 853 liberally in order to effectuate its remedial purpose. *Id.* § 853(*o*). In the context of criminal-forfeiture determinations, we review "[f]indings of fact . . . for clear error, and the question whether those facts are sufficient to constitute a proper criminal forfeiture . . . de novo." *United States v. Evers*, 669 F.3d 645, 660 (6th Cir. 2012). In *United States v. Hampton*, 732 F.3d 687 (6th Cir. 2013), we foreclosed Rovedo's argument that a forfeiture order is improper based on her lack of assets. There, we joined the Second, Third, Ninth, and Tenth Circuits in holding that "the amount of the forfeiture is measured by the amount of the proceeds received by a defendant—not the amount of assets a defendant retains at the time of sentencing." *Id.* at 692; *see also id.* at 691 (noting that criminal-forfeiture orders are mandatory). Moreover, sufficient evidence demonstrated that the "total proceeds" of this conspiracy, *see United States v. Blackman*, 746 F.3d 137, 144 (4th Cir. 2014), eclipsed $3.5 million. The district court's forfeiture determination was not clearly erroneous.

### B.     *Darji*

In his appeal, Darji argues that: (1) the rule of lenity should apply to reverse his conviction under the CSA; (2) the CSA is unconstitutionally vague as applied to him; (3) the district court should not have instructed the jury on willful ignorance; (4) the district court

abused its discretion by excluding certain evidence from his trial; and (5) the district court abused its discretion by denying his motion for a new trial.

### 1. The Rule of Lenity Is Not Applicable in Darji's Case

Darji argues both that the CSA is unconstitutionally vague as applied to him and that, even if the law could be interpreted to apply to him, the rule of lenity should resolve the law's ambiguity in his favor. Under *Skilling v. United States*, 561 U.S. 358, 405-06 (2010), federal courts must first consider limiting constructions such as the rule of lenity before addressing a vagueness challenge. *See United States v. Tobin*, 676 F.3d 1264, 1273 (11th Cir. 2012), *abrogated on other grounds as recognized in United States v. Castro*, 736 F.3d 1308, 1313 (11th Cir. 2013). Accordingly, we first address Darji's lenity argument.

We review statutory-interpretation questions de novo, starting with the language of the statute itself to determine the presence or absence of any ambiguity. *United States v. Moore*, 567 F.3d 187, 190 (6th Cir. 2009). If the statutory language is clear and unambiguous, "the Court will usually proceed no further." *United States v. Bailey*, 228 F.3d 637, 638 (6th Cir. 2000). "In evaluating whether a statute is ambiguous for rule-of-lenity purposes, it is not enough for the plain language to be unclear; only when the plain language, structure, and legislative history provide no guidance will we apply the rule of lenity." *United States v. Wagner*, 382 F.3d 598, 611 (6th Cir. 2004). The rule of lenity applies "only if, after using the usual tools of statutory construction, we are left with a 'grievous ambiguity or uncertainty in the statute.'" *Robers v. United States*, 134 S. Ct. 1854, 1859 (2014) (quoting *Miscarello v. United States*, 524 U.S. 125, 139 (1998)).

No such ambiguity pervades the CSA's proscription of distribution of controlled substances such as hydrocodone. Under 21 U.S.C. § 841(a)(1), "it shall be unlawful for any

person knowingly or intentionally . . . to distribute[ ] or dispense . . . a controlled substance." Under § 829, however, "practitioner[s]" may dispense Schedule III and Schedule IV substances with a "prescription." *Id.* § 829(b). Specifically, a prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Darji argues that § 1306.04(a) is ambiguous because numerous licensed physicians involved in the conspiracy "embraced the technological advancements of the telephone and internet," suggesting that "the practice of prescriptions based upon a review of medical records and a telephone consultation were within the usual course of professional medical practice." He further contends that because Congress did not prohibit the distribution of controlled substances over the internet without face-to-face consultations until 2008, *see* the Ryan Haight Online Pharmacy Consumer Protection Act (the "Ryan Haight Act"), Pub. L. No. 110-425, 122 Stat. 4820 (2008),[4] the law regarding distribution of prescriptions online at the time of his conduct was ambiguous.

These arguments fail. As an initial matter, this Court long ago held that "the language in § 841(a)(1) and 21 C.F.R. § 1306.04(a) clearly defines the pharmacist's responsibilities that give rise to conduct that constitutes an unlawful distribution of a prescription drug." *United States v. DeBoer*, 966 F.2d 1066, 1068-69 (6th Cir. 1992). Therefore, because the standard applicable to the writing of prescriptions for controlled substances is not ambiguous, the rule of lenity has no application in Darji's case. Moreover, that the doctors involved in the conspiracy willingly participated in the dispensation of controlled substances based on cursory consultations and review of medical records on an internet platform is not compelling evidence of the statute's

---

[4]The Ryan Haight Act amended the CSA to prohibit the distribution of controlled substances over the internet. *See* 21 U.S.C. §§ 829(e)(1), 841(h). The Act also defined "valid prescription" as "a prescription that is issued for a legitimate medical purpose in the usual course of professional practice by . . . a practitioner who has conducted at least 1 in-person medical evaluation of the patient." *Id.* § 829(e)(2)(A)(i).

ambiguity. *See Tobin*, 676 F.3d at 1275 ("Congress's decision to amend the CSA in 2008 is best understood as confirming that under the CSA, it is unlawful to distribute controlled substances *without a valid prescription*, regardless of whether the prescription is made in person, by mail, by phone, or through the Internet." (emphasis added)); *see also Moskal v. United States*, 498 U.S. 103, 108 (1990) ("[W]e have declined to deem a statute 'ambiguous' for purposes of lenity merely because it was *possible* to articulate a construction more narrow than that urged by the Government.").

In support of his contention that the statute is ambiguous, Darji also cites the Supreme Court's opinion in *Gonzales v. Oregon*, in which the Court described "the statutory phrase 'legitimate medical purpose' [as] a generality, susceptible to more precise definition and open to varying constructions." 546 U.S. 243, 258 (2006). But the Court made this statement in the context of determining whether an Attorney General Interpretive Rule regarding doctor-assisted suicide deserved deference, not in the context of determining the constitutionality of the CSA itself. *Id.* To the contrary, the Supreme Court has upheld and applied the standards set forth in the statute to uphold the conviction of a physician who prescribed methadone outside of the bounds of professional practice based on "inadequate physical examinations or none at all." *United States v. Moore*, 423 U.S. 122, 142-43 (1975); *see also id.* at 145 (declining to apply the rule of lenity to § 841(a)(1)).

Ultimately, the plain language of the CSA as it existed prior to the Ryan Haight Act "makes it clear that the channel through which controlled substances are distributed is of no consequence." *Tobin*, 676 F.3d at 1277; *see also United States v. Birbragher*, 603 F.3d 478, 487 (8th Cir. 2010) ("Birbragher was not indicted because his business . . . utilized the internet to distribute controlled substances. Rather, he was prosecuted for conspiring with doctors and

pharmacists to distribute controlled substances in a manner which the government alleges is outside the usual course of professional practice.").[5]  A pharmacist with Darji's experience cannot be characterized as "the unwitting victim of a law he didn't understand."[6]  *United States v. Lovern*, 590 F.3d 1095, 1103 (10th Cir. 2009).

Because well-established law in this Circuit dictates that § 841(a)(1) and § 1306.04(a) are not ambiguous, we decline to employ the rule of lenity to reverse Darji's convictions.

2.        *The CSA Is Not Unconstitutionally Vague as Applied to Darji*

Darji next argues that § 841(a)(1) is unconstitutionally vague as applied to him because it was impossible for him to know the legal standard governing his conduct prior to the passage of the Ryan Haight Act.  He argues that no reasonable person in his position could have known that his business model was illegal.  Based on the rule-of-lenity analysis set forth above, Darji's argument must fail.

As previously noted, this Court has rejected the claim that § 841 and § 1306.04(a) are void for vagueness.  *DeBoer*, 966 F.2d at 1068-69.  Moreover, Darji mischaracterizes the government's case as "based primarily on the assertion of a *per se* rule that a prescription is invalid, no matter how thoroughly vetted, if there was no face to face consultation."  Darji was not indicted—and the jury was not instructed—under the Ryan Haight Act, but rather under the

---

[5]To the extent Darji insists his conviction was based on the failure to conduct face-to-face evaluations with patients as required by the Ryan Haight Act in violation of the Ex Post Facto Clause, U.S. Const. art. I, sec. 10, cl. 1, the argument fails for the reasons articulated by the Eighth Circuit in *Birbragher*.  *See* 603 F.3d at 487.  Conspiring to distribute controlled substances in the manner alleged in the indictment would violate § 841(a)(1) regardless of the means used to carry out the distribution—in this case, the internet.  *Id.*  Moreover, the district court's instructions to the jury regarding the elements of the charged offenses did not mention the face-to-face requirement of the Ryan Haight Act; rather, the instructions closely tracked the requirements of § 841(a)(1) and § 1306.04(a) as they existed prior to the Act's passage.

[6]The district court indicated at Darji's sentencing that the face-to-face argument was a "red herring," and that the real issue in the case was the writing and filling of "prescriptions without regard to what was happening to the people who were placing those prescriptions."

more general standards applicable to prescription of controlled substances outside the bounds of professional practice, which courts have recognized for decades. *See Moore*, 423 U.S. at 142-43.

Moreover, in rejecting Darji's void-for-vagueness argument, we join a considerable weight of precedent rejecting virtually identical claims in the context of internet pharmacies. *See, e.g.*, *Tobin*, 676 F.3d at 1278 (holding that the CSA had "sufficient definiteness"); *United States v. Bansal*, 663 F.3d 634, 656-57 (3d Cir. 2011) ("Strictly speaking, [the defendants] were not charged with distributing controlled substances via the internet; they were charged with distributing controlled substances, period."); *Birbragher*, 603 F.3d at 488-89 ("Birbragher had adequate notice that the distribution of controlled substances outside the course of professional practice violated the CSA regardless of the means of distribution."); *Lovern*, 590 F.3d at 1103; *United States v. Quinones*, 536 F. Supp. 2d 267, 271 (E.D.N.Y. 2008) ("That the moving defendants allegedly carried out their activities through the Internet is of no consequence. . . . If the means [used to distribute controlled substances] are within the usual scope of professional practice, they are legal; if they are outside that scope, they are illegal.").

Ultimately, Darji is analogous to the defendant as described in the Tenth Circuit's opinion in *Lovern*:

> Mr. Lovern was a pharmacist with decades of experience. According to his own testimony, Mr. Lovern understood that he had a legal duty to ensure he filled only those prescriptions issued in the usual course of medical practice. He understood as well that a patient-physician relationship, including a physical examination, usually precedes a prescription in contemporary medical practice. And he knew that the prescriptions he filled at [the defendant pharmacy] were issued after a customer filled in an online questionnaire with no follow-up physical examination or consultation with a physician. A reasonable jury could find that Mr. Lovern knowingly filled prescriptions outside the usual course of medical practice, something Mr. Lovern admitted he could not do lawfully. On this record, we cannot say that Mr. Lovern was the unwitting victim of a law he didn't understand.

590 F.3d at 1103. Similarly here, a reasonable jury could have found that Darji knowingly filled prescriptions outside the usual course of medical practice through the USMeds and Delta Health organizations. We do not find 21 U.S.C. § 841(a)(1) or 21 C.F.R. § 1306.04(a) unconstitutionally vague as applied to Darji.

> 3.   *The District Court Did Not Err by Instructing the Jury on Willful Ignorance*

Darji also argues that the district court should not have instructed the jury regarding willful ignorance because the evidence demonstrated that he verified that all physicians with whom he conducted business had valid licenses and that his technicians checked underlying medical records. The government contends that the evidence was rife with "red flags" that should have alerted Darji to the illegality of the conspiracy's operation, thereby validating the court's delivery of the willful-ignorance instruction. The government's argument prevails.

We review challenges to a jury instruction for abuse of discretion. *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012). The district court "does not abuse its discretion unless the jury charge fails accurately to reflect the law." *Id.* (quoting *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010)) (internal quotation marks omitted). "An improper instruction requires reversal of the judgment 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'" *Id.* (quoting *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008)). The willful-ignorance instruction is appropriate where "(1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance"—i.e., where "there is evidence to support an inference 'that the defendant acted with reckless disregard of [the high probability of illegality] or with a conscious purpose to avoid learning the truth.'" *Id.* (alteration in original) (quoting *United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980)). While the instruction "should be used sparingly because of the heightened

risk of a conviction based on mere negligence, carelessness, or ignorance," *Geisen*, 612 F.3d at 486, we have "approved the giving of this instruction to show a conspirator's knowledge of the unlawful aims of a conspiracy." *Mitchell*, 681 F.3d at 879 (quoting *United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010)) (internal quotation marks omitted).

Initially, we note that the district court's willful-ignorance instruction exactly mirrored Sixth Circuit Pattern Jury Instruction 2.09. We repeatedly have held that Instruction 2.09 is an accurate statement of the law. *See, e.g.*, *United States v. Reichert*, 747 F.3d 445, 451 (6th Cir. 2014). "[E]ven when it is unsupported by evidence, a deliberate ignorance instruction that properly states the law is harmless error." *United States v. Rayborn*, 491 F.3d 513, 520 (6th Cir. 2007). Therefore, any error attributable to the district court's willful-ignorance instruction is harmless.

However, there was no error because substantial evidence supported the district court's decision to give the instruction. The distribution of hydrocodone from Darji's pharmacies far outstripped state and national averages, and Darji often shipped multiple high-strength dosages to the same address under different names. Moreover, Darji received highly inflated dispensing fees for controlled substances versus non-controlled substances. Intercepted phone calls also indicated that Darji intentionally ordered lower ratios of controlled versus non-controlled medication and shifted prescriptions among his three pharmacies in order to avoid DEA scrutiny regarding the amount of hydrocodone coming into his pharmacies. At the very least, this evidence indicates that Darji may intentionally have ignored numerous "red flags" regarding the illegality of the conspiracy. *Cf. Mitchell*, 681 F.3d at 878-79. Accordingly, the district court did not abuse its discretion by instructing the jury on willful ignorance.

4.      *The District Court Did Not Abuse Its Discretion by Excluding Certain Evidence from Darji's Trial*

Darji argues that the district court erred by excluding two key pieces of evidence from his trial: (1) a May 2005 letter written by attorney Max Kravitz to the DEA; and (2) the testimony of former DEA Diversion Investigator John Mudri, who conducted an on-site inspection of the Medicom pharmacy on January 30, 2006. Darji argues that he offered the letter to show his state of mind rather than to demonstrate the truth or legal accuracy of Kravitz's opinion. Darji further argues that Mudri reviewed a website analogous to USMeds and prepared a report in which he did not advise Darji that filling online prescriptions would violate the CSA, thereby demonstrating Darji's lack of intent to violate the law. The government responds that the district court properly excluded the letter—an advocacy document addressed to investigators at the DEA—because it was premised on untrue factual predicates regarding the workings of the conspiracy and did not properly support an advice-of-counsel defense. And in any event, the government argues, any error from the letter's exclusion was harmless because Darji effectively read the letter into evidence during his testimony. The government further argues that the district court properly excluded Mudri's testimony because it regarded "observations"—i.e., improper expert opinion testimony—about a website completely unrelated to USMeds. We find the government's arguments more persuasive.

We review a district court's evidentiary decisions for an abuse of discretion, which occurs only when the district court's determination was based "'on clearly erroneous findings of fact, improperly applie[d] the law, or employ[ed] an erroneous legal standard,' or when we are 'firmly convinced that a mistake has been made, *i.e.*, when we are left with a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014) (citation omitted) (quoting *Griffin v. Finkbeiner*, 689 F.3d 584,

592 (6th Cir. 2012); *United States v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003)). Even erroneous evidentiary rulings require reversal only if they "affected the outcome of the trial." *Id.* (quoting *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013)) (internal quotation marks omitted).

The district court ruled the Kravitz letter inadmissible under Rule 403 of the Federal Rules of Evidence, which provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." This was not an abuse of discretion. When reviewing Rule 403 balancing determinations, we "must maximize the probative value of the challenged evidence and minimize its potential for unfair prejudice." *United States v. Adams*, 722 F.3d 788, 812 (6th Cir. 2013) (quoting *United States v. Lloyd*, 462 F.3d 510, 516 (6th Cir. 2006)) (internal quotation marks omitted).

The basis of the district court's exclusion of the letter was that it was not a communication between Kravitz and Darji, rendering it improper for use in an advice-of-counsel defense. *See United States v. Geiger*, 303 F. App'x 327, 330 (6th Cir. 2008) ("The prima facie elements of an advice-of-counsel defense are (1) full disclosure of all pertinent facts and (2) good faith reliance on the advice of counsel."). Further, the district court emphasized that the letter contained numerous questionable factual assumptions regarding the mechanics of the conspiracy. For example, the letter set forth Kravitz's understanding that, prior to issuing a prescription, doctors involved in the conspiracy required "each patient [to] have undergone a relatively recent (approximately one-year old or less) face-to-face physical examination by a physician leading to a diagnosis supporting a prescription to treat the diagnosis." The letter had

little to no probative value regarding advice of counsel because it was not addressed from an attorney to Darji. Moreover, the risk of prejudicing the government or confusing the jury was considerable in light of the unsupported factual postulates on which the letter rested. Given the district court's "broad discretion in balancing probative value against potential prejudicial impact," *United States v. Layne*, 192 F.3d 556, 573 (6th Cir. 1999), we see no reason to disturb the court's Rule 403 determination.

This is especially true in light of the fact that any error resulting from the exclusion of the letter was harmless. The district court explicitly allowed Darji to testify regarding whether "he had certain views of the law and if he relied upon certain things, such as what the lawyer told him or represented to him." Moreover, during Darji's direct examination, Darji's attorney read the portions of Kravitz's letter he deemed relevant out loud, asking Darji about them. Therefore, it is unlikely that the exclusion of the letter itself materially affected the verdict, rendering any putative error harmless. *Lloyd*, 462 F.3d at 516.

Regarding Mudri's testimony, the district court refused "to take a person who's opened up a business as a consultant based on his experience, background, and expertise in an agency, and then to treat him as a layperson at trial, and allow [him] to not only testify to what people told [him], but about what [his] opinions are." The court viewed Mudri's anticipated testimony as "an expert opinion as to what's legal, what's not legal." This was not an abuse of discretion. Under Federal Rule of Evidence 701(c), "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See also* Fed. R. Evid. 702 (requiring expert witnesses to be "qualified . . . by knowledge, skill, experience, training, or education").

As Darji admitted in his response to the government's motion to exclude Mudri's testimony, the testimony would be based on Mudri's "almost 30 years as a DEA Diversion Investigator and DEA manager." His observations regarding the legality of Darji's Medicom pharmacy would therefore be well outside the ken of an ordinary layperson.[7] Rule 701(c) is

> intended to preclude a party from surreptitiously circumventing "the reliability requirements set forth in Rule 702 . . . through the simple expedient of proffering an expert in lay witness clothing" and to "ensure[ ] that a party will not evade the expert witness disclosure requirements set forth in . . . Fed. R. Crim. P. 16[8] by simply calling an expert witness in the guise of a layperson."

*United States v. White*, 492 F.3d 380, 400-01 (6th Cir. 2007) (alteration in original) (quoting Fed. R. Evid. 701 advisory committee notes (2000 Amendments)). The district court appropriately rejected the defense's attempt to "bootstrap" Mudri's expert testimony in as lay witness testimony. This determination was not an abuse of discretion.

> 5. *The District Court Did Not Abuse Its Discretion by Denying Darji's Motion for a New Trial*

Finally, Darji argues that the district court should have granted his motion for a new trial under Federal Rule of Criminal Procedure 33.[9] Darji argues that he relied on advice from his attorney and DEA guidance documents to reach his understanding that the law did not require face-to-face meetings between prescribing physicians and patients. He argues that every prescription he filled was written by a licensed physician and that he conducted routine inquiries to verify the prescriptions, credentials, and practices of every physician whose prescriptions he

---

[7]Darji attempted to analogize Mudri to the laypersons the court allowed to testify in *United States v. Whaley*, 860 F. Supp. 2d 584 (E.D. Tenn. 2012), because their testimony was not based upon specialized knowledge within the scope of Rule 702, but rather "upon their own 'particularized knowledge,' i.e., their familiarity with the underwriting process and lending policies at their banks, that they have due to their employment at their respective banks." *Id.* at 596. Here, as noted by the district court, Mudri's testimony would not be based upon his experience with Medicom's processes gained through employment there, but rather upon his experience with the DEA. Accordingly, *Whaley* is not on all fours.

[8]Federal Rule of Criminal Procedure 16(b)(1)(C) requires the defendant to provide the government with a written summary of any expert-witness testimony that "describe[s] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Darji's counsel did not provide the government with such a summary or designate Mudri as an expert witness in this case.

filled. He suggests that this demonstrates that the jury's verdict was against the manifest weight of the evidence. The government responds that overwhelming evidence—including the inflated fill fees and prices of hydrocodone and the abnormally high volume of hydrocodone prescriptions written by participating doctors for customers across the country—supported the district court's decision to deny the motion for a new trial. The government's argument prevails.

Jury verdicts are presumed valid; "the burden is on the defendant to demonstrate that a new trial ought to be granted." 3 Charles Alan Wright & Sarah N. Welling, *Federal Practice and Procedure*, § 581, at 437 (4th ed. 2011). "The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence.'" *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (alteration in original) (quoting *United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006)). Such a motion should be granted "only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592-93 (6th Cir. 2007) (internal quotation marks omitted). "[A] district court judge, who had a ring-side seat at the trial, may appropriately act as a thirteenth juror, assessing the credibility of the witnesses and the weight of the evidence. Yet appellate court judges, who have only a transcript to work with, have no such authority." *Dimora*, 750 F.3d at 627-28 (citation omitted) (quoting *Hughes*, 505 F.3d at 593) (internal quotation marks omitted).

The district court's denial of Darji's motion for a new trial was not an abuse of discretion because ample evidence supported the jury's verdict. The district court cited evidence in the record that customers pre-selected the medication to be prescribed, that USMeds did not accept health insurance, and that USMeds customers paid a price substantially higher than the retail

---

[9]This rule provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

price for hydrocodone. The court also noted that Darji received highly inflated dispensing fees—$20 per order versus the national average of $0.50 to $2.50. Substantial evidence supported the jury's conclusion that Darji dispensed hydrocodone outside of the usual course of professional practice. Moreover, as noted above, considerable evidence supported a finding that Darji willfully ignored the illegality of the conspiracy. This includes Darji's own admissions that Dr. Fernandez, a psychiatrist, should not have been seeing patients for chronic pain conditions; that psychiatrists generally do not prescribe hydrocodone; and that, despite these facts, Darji never contacted Dr. Fernandez regarding her thousands of prescriptions.

In sum, the evidence did not preponderate heavily against Darji's convictions. *Cf. Dimora*, 750 F.3d at 627. On abuse-of-discretion review, we can find no reason in the record to upend either the jury's verdict or the district court's denial of Darji's motion for a new trial.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgments of the district court.